```
            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,    )
                             )
              Plaintiff,     )         4:07CR3164
                             )
      v.                     )
                             )
AGUSTIN MORALES-MATA,        )
                             )
              Defendant.     )
                             )

UNITED STATES OF AMERICA,    )
                             )
              Plaintiff,     )         4:07CR3166
                             )
      v.                     )
                             )         REPORT AND RECOMMENDATION
YESENIA SANCHEZ,             )
                             )
              Defendant.     )
                             )
```

On November 19, 2007, defendant Agustin Morales-Mata was driving a 2000 Ford Minivan on Interstate 80 in Nebraska when the vehicle was stopped, and later searched, by Nebraska State Patrol Trooper David Frye. Defendant Yesenia Sanchez was a passenger in the vehicle at the time of the stop. Though Sanchez and Morales-Mata were separately indicted and separate criminal cases are pending, both are charged with conspiring to distribute or possess with intent to distribute 5 kilograms or more of cocaine on November 19, 2007. Trooper Frye discovered evidence supporting these indictments during his search of the 2000 Ford Minivan.

Pending before me are the motions to suppress filed by defendant Sanchez, (Case No. 4:07CR3166, filing 23), and defendant Morales-Mata, (Case No. 4:07CR3164, filing 18). The defendants claim the November 19, 2007 traffic stop, detention,

and vehicle search violated their Fourth Amendment rights, and all evidence obtained as a result of the illegal stop and search must be suppressed.[1]

A joint evidentiary hearing was conducted on defendants' motions.  This report and recommendation therefore addresses the motions to suppress filed in both defendants' cases.  For the reasons discussed below, I find the motions to suppress should be denied.

FINDINGS OF FACT

On November 19, 2007, at approximately 12:15 p.m., Trooper Fyre was patrolling Interstate 80 westbound near Lincoln, Nebraska when he noticed an approaching white minivan with no front license plate.  See exhibit 1 (in-car camera DVD).[2]  After the eastbound minivan passed, Trooper Frye looked back and saw that the minivan had no rear license plate, although a piece of paper appeared to be posted in the rear plate area.

---

[1] The defendants seek to suppress "all evidence, and any statements taken . . . following the illegal stop of the vehicle on November 19, 2007."  (Case No. 07cr3164, filing 19, p. 2). See also Case No. 07cr3166, filing 26 (adopting the arguments raised by defendant Morales-Mata).  At the close of the evidentiary hearing, the defendants clarified that they seek suppression of the statements as fruit of the alleged Fourth Amendment violations, and not on the basis of any alleged Fifth Amendment violations.

[2] Trooper Frye explained that his in-car camera was activated prior to the stop and recorded the events occurring during the stop.  The time referenced on the DVD is off by one hour because the officer has problems changing the camera clock to adjust for the start and end of daylight savings time.

2

Trooper Frye crossed the median and pursued the white minivan.  While following the vehicle, Trooper Frye could not read the paper posted in the rear plate area, and he could not see anything indicating which state, if any, had registered the vehicle.  Trooper Frye testified that Nebraska-licensed vehicles must display plates on both the front and rear bumper area, and Nebraska in-transit vehicles must have Nebraska-issued in-transit paperwork posted on both the front and rear window, or on both the left and right rear of the vehicle.  The white minivan did not appear to be tagged in accordance with Nebraska law.

Trooper Frye activated his lights and initiated a traffic stop.  The defendants promptly pulled over.  Trooper Frye exited his patrol vehicle and approached the passenger side of the vehicle.  As he approached, he bent down and looked at the paper posted in the rear plate area.  Although "Arizona Temporary Registration Plate" was typed in small print on the bottom center of the paper, (see exhibits 3, 4, and 102), Trooper Frye did not see these words when he looked at the paper.  Trooper Frye had been a state trooper for ten years and had never seen this type of paper posted on a vehicle as a state-issued temporary registration decal.

Trooper Frye spoke to the vehicle occupants.  He saw a tree-shaped air freshener hanging from the rearview mirror and obstructing the view through the windshield.  He also noted an extremely strong odor of air freshener emanating from the vehicle.

Trooper Frye questioned the vehicle occupants and identified the driver as defendant Morales-Mata, the front seat passenger as 14-year-old Gloria Contreras, and the rear seat passengers as

defendant Sanchez and an infant child.  Trooper Frye asked the driver for his operators license and vehicle paperwork. Defendant Morales-Mata produced the vehicle title, (exhibit 6), and a Mexican drivers license and Mexican voter card issued to "Marco Antonio Mendez," (see exhibit 5).  Trooper Frye reviewed the title and discovered it was an "open title," meaning the seller had signed the title, but the buyer had not.  Under such circumstances, the title holder could sign the title as the buyer and thereby become the owner of the vehicle.  The title was issued in Arizona.

   Trooper Frye testified that it is unlawful to hold an "open title."  Moreover, law enforcement officers are trained to watch for open title vehicles because open titles are sometimes used to sever or conceal any connection between the vehicle's occupants and the ownership or control of a vehicle used to transport illegal drugs.

   The primary language for defendants Sanchez and Morales-Mata was Spanish, and a language barrier existed between the defendants and Trooper Frye.  However, during the course of the stop, Ms. Contreras served as an interpreter and provided vehicle ownership documents to Trooper Frye.  In response to Trooper Frye's questions, the defendants and Ms. Contreras stated they were headed to Des Moines, Iowa to visit family.  Trooper Frye asked about the open title, and defendant Morales-Mata explained they were hoping to sell the van to some relatives in Des Moines. When Trooper Frye asked how they intended to return home after selling the vehicle in Des Moines, defendant Morales-Mata laughed and stated he hoped the buyers would take them home.

Trooper Frye reviewed the vehicle paperwork and discovered inconsistencies between defendant Morales-Mata's statements and the notations and names on the vehicle title.  Defendant Morales-Mata stated Juan Morales sold him the vehicle, but based on the documents provided, Juan Morales had never owned or registered the vehicle.  In response to additional questioning by Trooper Frye, Morales-Mata explained that the vehicle owner named in the title, Luis Salazar, decided he no longer needed the vehicle because he was moving to Mexico, so he sold the vehicle to "Juan Morales," who in turn sold the vehicle to the driver "Marco Mendez," later identified as defendant Morales-Mato.  Defendant Morales-Mato stated Salazar had moved to Mexico fifteen days before the November 19, 2007 traffic stop.  However, based on the title and temporary vehicle registration documents provided to Trooper Frye during the course of the stop, Salazar was located in Arizona, not Mexico, when he applied for and received a temporary vehicle registration on November 10, 2007, and when he affixed his notarized signature to the vehicle title on November 18, 2007.  See exhibit 6.

Trooper Frye asked defendant Morales-Mato to exit the vehicle.  Before walking back to the patrol vehicle, Trooper Frye looked at the undercarriage of the minivan.  Although he told defendant Morales-Mata that he was inspecting the undercarriage for possible leaking water or oil, he was actually looking for alterations indicative of drug transport.  Based on his drug interdiction training and experience, Trooper Frye was aware that illegal drugs were sometimes transported in compartments created in the undercarriage area of Ford minivans.  Trooper Frye noticed undercoating spray and overspray, (see e.g. exhibits 10 and 11), and the odor of "Bondo," an autobody compound often used to seal hidden compartments.  This observation further aroused Trooper

Frye's suspicion of illegal activity because undercoating spray is commonly used to conceal hidden compartments added to a vehicle's undercarriage. On every past traffic stop when Trooper Frye discovered fresh vehicle undercoating spray, he had always found hidden vehicle compartments used for transporting illegal drugs.

Trooper Frye and defendant Morales-Mata were seated in the patrol vehicle. Trooper Frye could see defendant Morales-Mata's pulse in his upper neck, indicating the defendant was extremely nervous. While Trooper Frye completed a warning and fix-it ticket, he conversed with defendant Morales-Mata. A language barrier existed. Defendant Morales-Mata was able to respond to some questions, but did not appear to understand others. Trooper Frye briefly discussed the proof of insurance for the vehicle, but obtained no additional information. He did not check defendant Morales-Mata's drivers license because Mexican authorities are unable to provide a timely response to such requests.

While seated in the patrol vehicle, Trooper Frye contacted Trooper Bigsby to assist with the stop. Trooper Bigsby arrived at the scene, parked behind Trooper Frye's patrol vehicle, and assisted in the investigation and search of the vehicle.

Trooper Frye completed a warning/fix-it ticket; the warning ticket for having a windshield obstruction, and the fix-it ticket for failing to have a license plate on the vehicle. Exhibit 12. Trooper Frye returned the vehicle documents, explained the ticket, and told defendant Morales-Mata to remove the air freshener obstructing the windshield. Defendant Morales-Mata appeared to understand these instructions. Trooper Frye stated

the traffic stop was over.  Defendant Morales-Mata responded by pulling the door handle to exit the vehicle.  Trooper Frye repeated that the traffic stop was over, but stated he wanted to speak further with defendant Morales-Mata.  Defendant Morales-Mata responded by closing the vehicle door.  Trooper Frye asked if he had any "pistolas" in the vehicle.  Defendant Morales-Mata stated he did not, and offered to let Trooper Frye to search the vehicle.

    Trooper Frye confirmed that defendant Morales-Mata was verbally consenting to a vehicle search and provided defendant Morales-Mata with a written consent to search form.  The Spanish version was provided at defendant Morales-Mata's request.  Defendant Morales-Mata read the consent form aloud and signed it.  Trooper Frye also asked defendant Sanchez for consent to search the vehicle.  She read and signed the written consent form.  See exhibit 13.  The defendant are adults who appeared of average intelligence.  They did not appear under the influence of drugs or alcohol.  Trooper Frye never threatened the defendants, and he made no promises to obtain their consent.  His tone was professional and courteous throughout the course of the traffic stop.

    Defendant Morales-Mata and the other vehicle occupants stood in a grassy area near the vehicle while the vehicle was searched.  The defendants watched the search from a distance close enough to converse with officers Frye and Bigsby, but neither defendant asked or indicated that the officers should stop searching the vehicle.  A hole was drilled in the undercarriage area and a hidden compartment containing illegal drugs was found.  The defendants were placed under arrest.

LEGAL ANALYSIS

   The defendants claim Trooper Frye violated the Fourth Amendment by conducting an unlawful traffic stop.  A traffic stop is lawful "where the police have probable cause to believe that a traffic violation has occurred."  Whren v. United States, 517 U.S. 806, 810 (1996).  "Any traffic violation, however minor, provides probable cause for a traffic stop."  U.S. v. Wright, 512 F.3d 466, 471 (8th Cir. 2008).  See also  United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007); United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004); United States v. Herrera-Martinez, 354 F.3d 932, 934 (8th Cir. 2004); United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002); United States v. Alcantar, 271 F.3d 731, 736 (8th  Cir. 2001).  "Courts are not to consider the motive for a stop as long as the reason for the stop is valid." United States v. Jones, 275 F.3d 673, 680 (8th Cir. 2001).  Although a traffic stop cannot be pretextual, "so long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining the lawfulness of the stop."  Alcantar, 271 F.3d at 736.  See also Whren, 517 U.S. at 812; United States v. Bell, 86 F.3d 820, 822 (8th Cir. 1996).

   The defendants claim the vehicle stop was unlawful because Trooper Frye lacked probable cause to believe the vehicle was improperly tagged or not lawfully registered.  They claim the "in-transit sticker" posted on the vehicle's rear plate area was validly issued under Arizona law, and the vehicle properly displayed decals in compliance with that state's law.  Under Arizona law, in lieu of a permanent registration, a vehicle owner can obtain a temporary general use registration that allows the vehicle to be operated for a period not exceeding 30 days.

During this 30-day time frame, the temporary general use registration must be displayed so that it is clearly visible from the outside of the vehicle.  A.R.S. § 28-2156.  See exhibit 101.

However, under the facts presented in this case, the court need not determine if the vehicle was properly tagged under Arizona law.  The determination of whether probable cause existed to stop a vehicle "is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time."  U.S. v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999).  If an officer makes a traffic stop based on a mistake, the legal determination of whether probable cause or reasonable suspicion existed for the stop is judged by whether the mistake was "objectively reasonable."  U.S. v. Washington, 455 F.3d 824, 827 (8th Cir. 2006).  A traffic stop based on a mistake of law or fact does not violate the Fourth Amendment if the officer's mistake in initiating the stop was objectively reasonable. Sanders, 196 F.3d at 913.

Trooper Frye is a Nebraska state patrol officer and, as such, must enforce Nebraska traffic laws.  Nebraska law requires vehicles traveling on its roadways to display an outward manifestation that the vehicle is validly registered.  State v. Holmes  2008 WL 436555, *3 (Neb. App 2008)(citing State v. Kling, 8 Neb. App. 631, 399 N.W.2d 240 (1999) and interpreting Neb. Rev. Stat. § 60-376).  Although the words "Arizona Temporary Registration Plate" were typed on the paper affixed to the rear plate area of the defendants' vehicle, these words could not be read by an officer observing the vehicle as it traveled on the roadway.  The typeface of "Arizona Temporary Registration Plate" was so small that even upon bending and looking at the paper at the time of the traffic stop, an officer could not reasonably be

expected to read these words from a distance beyond two feet, and there was no other writing or symbol on the paper clearly identifying it as an Arizona-issued in-transit decal.  Trooper Frye had never seen such a paper used before as a state-issued in-transit sticker.

Even if the court assumes the defendants' vehicle was properly tagged under Arizona law, and that Trooper Frye was mistaken in believing that the paper affixed was not state-issued or did not comply with Arizona law, Trooper Frye was nonetheless objectively reasonable in believing there was probable cause to stop the vehicle for failing to display visible evidence that the vehicle was properly registered.[3]  The traffic stop did not violate the Fourth Amendment.  See e.g., U.S. v. Molson, 2006 WL 18904, *5 (D. Neb. 2006)(Gossett, M.J.)(holding vehicle stop was justified, even if based on a mistaken premise of law or fact, where the officer was objectively reasonable in believing the vehicle lacked valid license plates or in-transit decals); Holmes, 2008 WL 436555, *3 (holding officer was justified in stopping a vehicle that did not have license plates in either the front or back and had a handwritten paper in the rear license plate holder, which the officer had never seen before); State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727 (2007)(officer's observation of a vehicle having only one Ohio license plate, rather than two, provided probable cause for stop of vehicle).

---

[3]Nebraska law also prohibits operating a vehicle with any object placed or hanging in a manner that obstructs or interferes with the operator's view through the windshield.  Neb. Rev. Stat. § 60-6,256.  However, based on the evidence presented, I am not convinced Trooper Fyre noticed and stopped this vehicle for having a windshield obstruction.

The defendants claim they were unlawfully detained and questioned during the stop.  After stopping a vehicle, a trooper may lawfully ask any questions reasonably related to the stop, which typically includes asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about the origin, destination, and purpose of his trip.  United States. v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994)(citing United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993); United States v. Richards, 967 F.2d 1189, 1192-93 (8th Cir. 1992)).  An officer may detain a motorist while the officer completes certain routine tasks related to the traffic violation, such as writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history.  Lyons, 486 F.3d at 371; Fuse, 391 F.3d at 927; United States v. White, 81 F.3d 775 (8th Cir. 1996).  "[A]s part of a reasonable investigation, an 'officer may also question a vehicle's passengers to verify information provided by the driver.'"  United States v. Ward, 484 F.3d 1059, 1061 (8th Cir. 2007)(quoting United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) and collecting cases).

   The defendants argue that Trooper Frye should have concluded the traffic stop after looking at the paper affixed to the rear plate area.  However, as previously discussed, a reasonable officer in Trooper Frye's position cannot be charged with being able to both read and know that the paper on the rear plate was an Arizona-issued registration.  Moreover, once a valid traffic stop occurred, Trooper Frye was authorized to detain the vehicle occupants while he checked the driver's license and vehicle registration information, and briefly questioned the occupants about the destination and purpose of the trip.  United States v. Allegree, 175 F.3d 648, 650 (8th Cir. 1999)(holding that even

11

though no headlight violation had occurred, and an immediate investigation of the headlights by the officer would have revealed that, the officer's investigation of the driver's license and vehicle registration and his questioning concerning the destination and purpose of the trip did not violate the Fourth Amendment).

Trooper Frye's initial questioning of the defendants focused on determining whether the vehicle was properly registered. Such questioning was reasonably related in scope to the circumstances justifying the traffic stop. U.S. v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999); United States. v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994). However, rather than confirming that the vehicle was registered, the officer's investigation of the vehicle papers raised serious doubts that the title and registration were actually legal. Moreover, the information obtained caused Trooper Frye to suspect the defendants were using the minivan to transport illegal drugs. Specifically, Trooper Frye noted the existence of an open title, discrepancies between the vehicle documents, discrepancies between Morales-Mata's statements and the information in the documents, the existence of fresh undercoating on the vehicle carriage, and the strong odor of air freshener in the vehicle (which is often used to mask the smell of illegal drugs). This information, considered in the totality, created reasonable suspicion that the defendants were engaged in illegal drug activity sufficient to justify Trooper Frye's additional investigatory questioning and detention of the defendants. See e.g. United States v. Jimenez, 478 F.3d 929, 932 (8th Cir. 2007)(holding that conflicting stories regarding the travel plans, unusual trip itinerary, occupant's nervousness, and visible modifications to the vehicle supported officer's

continued detention and investigation of the motorists).

At the conclusion of the traffic stop, Trooper Frye handed defendant Morales-Mata his warning/fix-it ticket and the defendants' documents, and told defendant Morales-Mata that the stop was complete. Trooper Frye remained seated in the patrol car, and as Morales-Mata began to exit, the trooper asked if Morales-Mata would answer some additional questions. Morales-Mata stopped exiting the patrol car and answered the officer's questions. The fact that Morales-Mata was informed that the stop was over and was in the process of leaving the patrol car before Trooper Frye inquired as to whether he could ask more questions supports a finding that the continued encounter was consensual. Flores, 474 F.3d at 1104. Trooper Frye did not unlawfully expand the stop in violation of the Fourth Amendment.

The defendants also claim the warrantless search of their vehicle violated the Fourth Amendment.[4] The government claims the search was lawful because the defendants consented to the vehicle search. The government has the burden of proving by a preponderance of the evidence that the defendants actually consented to the search of their vehicle or that a reasonable

---

[4] As to the search, the defendants' briefs argue that the search occurring after the warning/fix-it ticket was issued violated the Fourth Amendment. The questioning at the hearing indicated the defendants may also be challenging Trooper Frye's observation of the undercarriage as an illegal search. Though I do not believe the defendants have adequately raised this issue as a basis for suppressing the evidence under the Fourth Amendment, even had they done so, the claim lacks merit. There is no reasonable expectation of privacy in the exterior of a vehicle. New York v. Class, 475 U.S. 106 (1986). The undercarriage is part of the vehicle's exterior and, accordingly, the brief visual examination of this area is not a search. U.S. v. Rascon-Ortiz, 994 F.2d 749, 754-755 (10th Cir. 1993).

officer in Trooper Frye's position would believe they did. <u>Jones</u>, 254 F.3d at 695; <u>United States v. Miller</u>, 20 F.3d 926, 930 (8th Cir. 1994).

Consent to search is voluntary if it was "the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied." <u>United States v. Flores</u>, 474 F.3d 1100, 1104 (8th Cir. 2007)(quoting <u>United States v. Bradley</u>, 234 F.3d 363, 366 (8th Cir. 2000)(quoting <u>United States v. Chaidez</u>, 906 F.2d 377, 380 (8th Cir. 1990)).  In determining whether a consent to search was voluntary, the court must look at the totality of the circumstances, including both the characteristics of the accused and the environment at the time consent was requested.  <u>Flores</u>, 474 F.3d at 1104.  The court considers the defendants' age, intelligence and education, whether they were under the influence of drugs or alcohol, whether they were informed of their right to withhold consent, and whether they were aware of rights afforded criminal suspects.  The court also considers the length of time the defendants were detained; whether they were threatened, physically intimidated, or punished by the police; whether the police made promises or misrepresentations to induce or coerce consent; whether they were in custody or under arrest when the consent was given; whether the encounter occurred in a public or a secluded place; and whether the defendants stood by silently as the search occurred.  <u>Flores</u>, 474 F.3d at 1104; <u>United States v. Esquivias</u>, 416 F.3d 696, 700 (8th Cir. 2005); <u>United States v. Chaidez</u>, 906 F.2d 377, 380 (8th Cir. 1990).  These factors serve as a valuable guide, but are not to be applied mechanically in determining the voluntary nature of defendants' consent.  <u>Flores</u>, 474 F.3d at 1104; <u>Chaidez</u>, 906 F.2d at 380.

At the time of the traffic stop, both defendants were adults. They appeared to have average intelligence, and did not appear to be under the influence of any drugs or alcohol. The traffic stop and the defendants' encounter with Trooper Frye occurred in daylight with continuous passing traffic on Interstate 80. Defendant Morales-Mata was the first to suggest that Trooper Frye search the vehicle, and only twenty minutes had passed between the time the stop was initiated and defendant Morales-Mata's offer to allow a vehicle search. Trooper Frye did not rely solely on the defendants' verbal consent, but obtained written consent to search from both defendants. The consent form was written in the defendants' primary language, Spanish, and was read aloud by both defendants before signing. The defendants were not under arrest. Though they were not told they could refuse to consent to a search, before any consent was given, both defendants were told the stop was over and all papers had been returned to defendant Morales-Mata. Trooper Frye did not intimidate or punish the defendants, and he made no threats or promises to either defendant. His tone was conversational and professional throughout. During the search, the defendants could have initiated contact with the officers to withdraw their consent, but they remained silent. Under the totality of these circumstances, I conclude the defendants' consent to search was voluntarily given and the search of the vehicle did not violate the Fourth Amendment. See e.g. United States v. Carrate, 122 F.3d 666, 670 (8th Cir. 1997)(holding the defendant voluntarily consented to the search where, despite his limited ability to speak English and the trooper's failure to use a written consent form or advise the defendant of his right to refuse consent, the defendant understood and appropriately answered the trooper's questions, had been detained for only a short time before consenting, was not threatened or physically intimidated, was not

promised anything or misled, was not under arrest when he consented, was on a public interstate, and stood idly by while the troopers searched his car, never indicating that he objected to the search.)

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Court Judge, that the motion to suppress filed by defendant Yesenia Sanchez, (Case No. 4:07CR3166, filing 23), and the motion to suppress filed by defendant Agustin Morales-Mata, (Case No. 4:07CR3164, filing 18), be denied in all respects.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

DATED this 2nd day of March, 2008.

BY THE COURT:

s/ *David L. Piester*
David L. Piester
United States Magistrate Judge